## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LARRY M. PRYOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-312** |
| | ) | **Electronic Filing** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

## I.    INTRODUCTION

Plaintiff Larry M. Pryor ("Pryor") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act").  The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level.  For the reasons that follow, the administrative decision made by the Commissioner in this case will be vacated, and the case will be remanded for further administrative proceedings consistent with this opinion.

## II.   PROCEDURAL HISTORY

Pryor applied for DIB on October 27, 2004, alleging disability as of October 14, 2004.  R. 44.  The claim was denied by the state agency on February 2, 2005.  R. 27.  Pryor filed a timely request for an administrative hearing on March 8, 2005.  R. 31.  On September 28, 2006, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge Michael Colligan (the "ALJ").  R. 377.  Pryor, who was unrepresented, appeared and testified at the hearing.  R. 379-387.  Dr. Noel Plummer ("Dr. Plummer"), an impartial vocational expert, also testified at the hearing.  R. 385-386.  In a decision dated December 21, 2006, the ALJ determined that Pryor was not "disabled" within the meaning of the Act.  R. 12-20.  The Appeals Council denied Pryor's request for review on January 4, 2008, thereby making the ALJ's decision the

final decision of the Commissioner in this case. R. 4. Pryor commenced this action on February 29, 2008, seeking judicial review of the Commissioner's administrative decision. Doc. No. 1. Pryor and the Commissioner filed cross-motions for summary judgment on June 8, 2008, and July 9, 2008, respectively. Doc. Nos. 5 & 8. These motions are the subject of this memorandum opinion.

## III.    STATEMENT OF THE CASE

Pryor was born on May 25, 1961, making him forty-five years of age on the date of the ALJ's decision. R. 12, 382. He was a "younger person" within the meaning of 20 C.F.R. § 404.1563(c). He served in the United States Army from October 5, 1984, through May 5, 1992. R. 44. In late 1990 and early 1991, he was stationed in Saudi Arabia in connection with Operations Desert Shield and Desert Storm.[1] During his time in the military, Pryor worked as a cook. R. 383. After his discharge from military service, Pryor worked as a housekeeper at a Veterans Administration ("VA") hospital. *Id.* He continued to work at the VA hospital until October 4, 2004, when the Office of Personnel Management ("OPM") approved his application for disability retirement and directed the Department of Veterans Affairs ("Department") to separate him from government service. R. 62. On that date, Pryor was informed in a letter that his annuity payments could not begin until the OPM received confirmation that he had applied for benefits under the Social Security Act. *Id.* In a rating decision dated October 15, 2004, the Department determined that Pryor had been suffering from a "generalized anxiety disorder" that was 100% disabling since October 18, 2001. R. 63. The Department had previously deemed this impairment to be 50% disabling. *Id.* Pryor's cessation of work activity and subsequent application for DIB were evidently triggered by the OPM's letter of October 4, 2004. R. 383.

## IV.    STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d

---

[1]It is not entirely clear from the record exactly when Pryor was stationed in Saudi Arabia. Nevertheless, it is undisputed that he was stationed there at some point during the 1991 Persian Gulf War. R. 366.

Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565,108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated

3

rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corporation*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. DISCUSSION

In his decision, the ALJ observed that Pryor had not engaged in substantial gainful activity since his alleged onset date of October 14, 2004. R. 17. Pryor was found to be suffering from an anxiety disorder, a personality disorder, gastroesophageal reflux disease, hypertension and sinusitis. *Id.* His anxiety disorder and personality disorder were deemed to be "severe" for purposes of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 404.1520(c), while the remaining impairments were deemed to be "non-severe." *Id.* The ALJ determined that Pryor's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 (the "Listing of Impairments"). R. 18. In accordance with 20 C.F.R. § 404.1545, the ALJ assessed Pryor's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at all levels of exertion. Nonexertionally, he can perform simple routine tasks in a low stress environment that do not entail more than minimal contact with the public.

*Id.* Given this assessment, the ALJ concluded that Pryor could return to his past relevant work as a housekeeper. R. 20. The ALJ also concluded that Pryor could work in various cleaning, janitorial or food preparation jobs. R. 20, 386. Dr. Plummer's testimony established that these additional jobs existed in the national economy for purposes of 42 U.S.C. § 423(d)(2)(A). R. 386.

Pryor challenges the ALJ's disregard for the determinations made by the OPM and the Department, the ALJ's reliance on opinions rendered by Dr. Stephen Perconte, Ph.D., and Raymond Dalton ("Dalton"), and the ALJ's credibility assessment at the administrative hearing. Doc. No. 6, pp. 11-19. His third argument, which concerns the ALJ's assessment of his credibility at the hearing, centers on the ALJ's failure to adequately develop the administrative record. *Id.*, pp. 18-19. Since it is that issue which most clearly warrants a remand in this case, it will be addressed first. The remaining two issues will be addressed thereafter.

This case is controlled by the decisions of the United States Court of Appeals for the Third Circuit in *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979), *Fargnoli v. Massanari*, 247 F.3d 34 (3d Cir. 2001), and *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003). In *Dobrowolsky*, the Court of Appeals recognized that an ALJ "must assume a more active role

when the claimant is unrepresented" in order to ensure that the record is fully developed. *Dobrowolsky*, 606 F.2d at 407. In *Fargnoli*, the Court of Appeals declared that a remand for further administrative proceedings is warranted where an ALJ fails to adequately explain the weight given to conflicting medical evidence contained in the record. *Fargnoli*, 247 F.3d at 42. *Reefer* involved a confluence of the issues involved in *Dobrowolsky* and *Fargnoli*, as the Court of Appeals found a remand necessary where an ALJ had both failed to assist a *pro se* litigant in developing the testimonial record and neglected to explain the weight given to conflicting portions of the documentary record. *Reefer*, 326 F.3d at 379-382. The ALJ's treatment of this case both at the hearing and in his opinion was woefully inadequate to satisfy the standards enunciated in *Dobrowolsky*, *Fargnoli* and *Reefer*.

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000)(plurality opinion). At an administrative hearing, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 111. This duty requires the ALJ to proceed with "a heightened level of care" when a claimant appears *pro se*. *Dobrowolsky*, 606 F.2d at 407. Implicit within this "heightened level of care" is an affirmative obligation to assist the claimant in developing a complete administrative record. *Reefer*, 326 F.3d at 380. The *pro se* status of a claimant does not convert the ALJ's role into that of the claimant's advocate. *Musgrave v. Sullivan*, 966 F.2d 1371, 1377 (10th Cir. 1992). Where the claimant has been informed of his or her right to counsel and knowingly elects to proceed without counsel, his or her *pro se* status is not *itself* a basis for remanding the case for a new hearing.[2] *Dobrowolsky*, 606 F.2d at 407. "Lack of counsel is sufficient cause for remand only if supported by a showing of clear prejudice or unfairness at the administrative hearing." *Id.* A review of the hearing transcript illustrates that the standard for obtaining a remand has been met in this case.

The hearing transcript takes up only eight and a half pages of the administrative record.

---

[2]In this context, the word "counsel" can refer to either a licensed attorney or a lay representative, since lay representatives are permitted to represent claimants in administrative proceedings before the Commissioner. 42 U.S.C. § 406(a)(1).

R. 379-387. After being advised of his right to one postponement of the hearing in order to secure counsel, Pryor affirmatively stated that he did not want an attorney. R. 379-380. In response to general questions posed by the ALJ, Pryor provided information such as his age, date of birth, educational background, and vocational history. R. 381-383. With respect to Pryor's impairments, the entire colloquy between the ALJ and Pryor consisted of the following:

Q.     Okay. Now, what happened that caused you to stop working with the VA?

A.     My, the anxiety of my nerves, I can't--

Q.     Okay, so you're--

A.     Sleep and--

Q.     You were having trouble performing your job?

A.     Yes.

Q.     Okay, were you fired or did you quit or what happened?

A.     They, my doctor put me off disability.

Q.     Okay, and are you--

A.     For my nerves.

Q.     Are you receiving any veteran's benefits?

A.     Yeah.

Q.     So you receive a pension?

A.     Yes.

Q.     Okay, and do you know the, do you know the percentage that you're getting?

A.     Yes, 100%.

Q.     Okay, service connected?

A.     Yes.

Q.     Okay. And it relates to your nerves?

A.     Yes.

Q.     Okay. And are you getting treatment for your condition?

A.     Yes, I am.

Q. And you're getting your treatment at the VA?

A. Yeah.

Q. And how often are you going in there for treatment?

A. I go every, sometime two months or three months.

Q. Every two or three months?

A. Yes.

Q. Okay, and do you, and that's when you see the doctor and discuss your medications, and so on?

A. Yes.

Q. Okay, and do you go in for counseling in between?

A. No, I just, I talk to her when I go to my treatments.

Q. Okay, you talk to the doctor when you see the doctor every two or three months?

A. Yeah.

Q. Okay, but do you see a counselor in between?

A. No.

Q. Are you participating in any groups or anything?

A. No.

Q. And, I think those are all the questions that I wanted to ask you. Is there anything that I have not asked you about that you want to tell me about your condition or what you can do or can't do? The, okay, we'll take some testimony from our vocational expert then, Dr. Plummer.

R. 383-385. The ALJ proceeded to pose a hypothetical question to Dr. Plummer that was consistent with his ultimate residual functional capacity assessment, and Dr. Plummer opined that the hypothetical individual referenced in the question could work in various housekeeping, cleaning, janitorial or food preparation jobs. R. 385-386. Pryor was never asked whether he wanted to cross-examine Dr. Plummer. When the ALJ began to tell Pryor that the hearing was about to conclude, Pryor indicated that he wanted to ask the ALJ a question. R. 386-387. Pryor vaguely referenced an unspecified question which had previously been posed to him by the ALJ, but then stated that he could not remember the question. R. 387. The ALJ abruptly closed the

8

hearing without attempting to ascertain the nature of Pryor's inquiry. *Id.*

The transcript of the administrative hearing in this case clearly illustrates that the ALJ completely failed to develop a testimonial record. Not only did the ALJ neglect to ask Pryor specific questions concerning his functional limitations, but he also closed the hearing without giving Pryor a reasonable opportunity to address his more general question about what Pryor was capable or incapable of doing. Under ordinary circumstances, a claimant's attorney or lay representative would be expected to pose questions to the claimant designed to extract testimonial evidence of functional limitations that would preclude the claimant from engaging in substantial gainful activity. Because Pryor was without counsel, the ALJ had a duty to "scrupulously and conscientiously probe into" all of the relevant facts. *Reefer*, 326 F.3d at 380; *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985); *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978). Instead of fulfilling this obligation, the ALJ permitted the hearing to end without eliciting a single piece of testimonial evidence concerning Pryor's ability to engage in work-related activities. This error was magnified by the ALJ's closure of the hearing immediately after Pryor had indicated that he wanted to answer the ALJ's earlier question, but that he could not remember precisely what the ALJ had asked. R. 387. The ALJ's conduct of the hearing clearly fell below the standards required under *Dobrowolsky* and *Reefer*. Moreover, Pryor was prejudiced by the ALJ's failure to develop the administrative record, since there is currently no testimonial evidence regarding Pryor's functional capacities. It cannot be readily assumed that Pryor would have been unable to establish the existence of a statutory disability in any event. The Department's medical examiner determined that Pryor was "unemployable due to the severity of [his] symptoms and [his] inability to handle minimal stress and interpersonal interaction present even in an unskilled job." R. 65. Under these circumstances, a remand for further administrative proceedings is obviously necessary.

Admittedly, Pryor shares some of the blame for the undeveloped state of the record. He evidently neglected to complete a daily activities questionnaire describing his activities and limitations. R. 18. This failure on Pryor's part, however, does not excuse the ALJ's failure to fully develop (or even partially develop) the testimonial record with respect to Pryor's work-

related limitations. The brief question posed to Pryor concerning what he could or could not do was not sufficient to satisfy the ALJ's duty to develop the record. It is apparent from the hearing transcript that Pryor sometimes has difficulty articulating himself. Courts have recognized that, under similar circumstances, an ALJ must take a more active role in attempting to elicit testimony regarding the claimant's ability or inability to work. *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1052 (6th Cir. 1983)("This difference in the articulateness of the claimant imposed a special duty on the ALJ to be especially probing in his questioning. This duty was not satisfied. Lashley was only superficially questioned concerning his daily activities and his physical limitations."). Pryor's reference at the end of the hearing to an earlier question posed by the ALJ may well have been a reference to the ALJ's question about Pryor's work-related capabilities. R. 387. Indeed, that is the most logical reading of the transcript. By closing the hearing without repeating or reformulating his question to Pryor, the ALJ effectively deprived Pryor of a meaningful opportunity to provide testimonial evidence in support of his claim. *Id.* This defect could not have been cured even if Pryor had completed a daily activities questionnaire. *Reefer*, 326 F.3d at 380 ("Rather, the ALJ appeared to base his credibility determination on the fact that Reefer's medical records did not explain why she was experiencing the symptoms she described in her responses to questionnaires. By relying solely on those responses, the ALJ was not able to assess Reefer's demeanor in answering those questions, which could have shed additional light on her credibility.").

A remand for further proceedings is required for an additional reason. Under *Fargnoli*, the ALJ was required to provide an adequate explanation for rejecting some evidence and crediting other evidence. *Fargnoli*, 247 F.3d at 42 ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."). The ALJ's evaluation of the evidence in this case was woefully inadequate. The ALJ implicitly acknowledged as much by making the following observations:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity,

> persistence and limiting effects of these symptoms are not entirely credible. In making this finding, the undersigned carefully read and considered all the evidence of record, regardless of whether it is specifically cited in the decision.

R. 18. As an initial matter, it is not clear what "statements" the ALJ was referring to. No testimony was taken concerning "the intensity, persistence and limiting effects" of Pryor's impairments. Thus, the ALJ had an "insufficient basis" for making a conclusion with respect to Pryor's credibility. *Reefer*, 326 F.3d at 380. In addition, the ALJ did not articulate his reasons for discounting the evidence that was favorable to Pryor, particularly the findings of the Department's medical examiner. Although the ALJ was not required to reference every treatment note contained in the record, he was required to sufficiently explain his reasoning in order to facilitate meaningful judicial review of his decision. *Fargnoli*, 247 F.3d at 42-44. It was not sufficient for the ALJ to simply state that he had "carefully read and considered" all of the relevant evidence, *regardless of whether it was specifically cited in his decision. Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimal level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."). On remand, the Commissioner must ensure that if the ultimate disability determination in this case is unfavorable to Pryor, the reasoning behind that determination is sufficiently clear to enable a reviewing court to perform its obligation under § 405(g).

Pryor makes additional arguments in support of his motion for summary judgment. He contends that the ALJ failed to accord proper weight to the determinations which had been made by the OPM and the Department. Doc. No. 6, pp. 11-12. The ALJ correctly observed that determinations of an individual's status as "disabled" made by other governmental agencies are not binding on the Commissioner in Social Security disability proceedings. R. 19; 20 C.F.R. § 404.1504. Nevertheless, under certain circumstances, such determinations are still entitled to "substantial weight." *Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985). Aside from noting that the findings made by the OPM and the Department did not "bind" him, the ALJ made no attempt to explain what weight (if any) he was according to those findings. R. 18-19. This

failure is particularly glaring in light of the fact that the ALJ alternatively disposed of Pryor's case at both the *fourth* and the fifth steps of the sequential evaluation process. R. 20. By concluding that Pryor could return to his past relevant work as a housekeeper, the ALJ necessarily concluded that Pryor could return to the very same job that the OPM and the Department had previously found him to be incapable of performing. No determination need be made as to whether the ALJ's failure to explain the weight given to the findings of the OPM and the Department would independently necessitate a remand if further administrative proceedings were not already required for other reasons. It suffices to say that, on remand, the Commissioner must give serious consideration to the conclusions of the OPM and the Department, to the extent that such conclusions are relevant to the question of "disability" as defined by the Social Security Act. *Kane*, 776 F.2d at 1135.

Pryor also challenges the ALJ's reliance on the findings of Dr. Perconte, who was both a treating and consultative examining physician, and Dalton, who evidently based his opinions on Dr. Perconte's findings. Doc. No. 6, pp. 12-17. Further comments about the medical evidence would normally be unwarranted, since it is the prerogative of the Commissioner to evaluate and weigh the conflicting medical evidence contained in the record. Nevertheless, the record contains some "evidence" that is particularly troubling, calling for additional observations concerning the probative value of the "medical opinions" challenged in Pryor's brief.

The ALJ's vague opinion does not directly mention Dr. Perconte's findings concerning Pryor's alleged "malingering," but those findings are vehemently contested in the briefs filed by the parties. Doc. No. 6, pp. 12-17; Doc. No. 9, pp. 7-12, 18-19. Although the record is somewhat unclear as to *when* Pryor was deployed to Saudi Arabia, it is undisputed that he was stationed there during Operations Desert Shield and Desert Storm. In the past, courts have taken judicial notice of the actions taken by the Iraqi government during the reign of Saddam Hussein. *Dawood-Haio v. Immigration & Naturalization Service*, 800 F.2d 90, 91 (6th Cir. 1986); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985). In this case, judicial notice may be taken of the tactics employed by Iraq during the 1991 Persian Gulf War. Throughout the course of the conflict, Iraq launched several Scud missiles against targets

in both Israel and Saudi Arabia. The attacks against Israel (a non-party to the war) were apparently designed to splinter the United Nations coalition that had been formed to liberate Kuwait, while the attacks against Saudi Arabia were presumably intended to kill or injure coalition forces. On February 25, 1991, a few days before the conclusion of the war, a Scud missile launched by Iraq against Saudi Arabia destroyed the barracks housing members of the 14th Quartermaster Detachment, which is based in Greensburg, Pennsylvania. Thirteen members of the 14th Quartermaster Detachment were killed, and forty-three members were wounded. 14th Quartermaster Detachment–Wikipedia, the free encyclopedia,

http://en.wikipedia.org/wiki/14th_Quartermaster_Detachment (as visited March 23, 2009). While some survivors of the attack were treated at Walter Reed Army Medical Center, others received treatment in western Pennsylvania.

Dr. Perconte treated Pryor for his mental impairments in connection with Pryor's status as a veteran. In a treatment note dated May 16, 2000, Dr. Perconte stated:

> The veteran did serve in the Persian Gulf War in Daharan for approximately six months, but his duty was restricted to food service work with no direct combat exposure. However, the veteran has historically (and during the present interview) attempted to misrepresent his combat exposure and activities. During today's evaluation, the veteran attempted at one point to suggest that he and his unit were adjacent to the 14th Quarter Masters Unit stationed out of Greensburg, when they were hit by the SCUD missile and lost 13 men. He also attempted to report that he and his unit were stationed along front combat lines. Neither of these claims, of course, is remotely factual.

R. 141-142. On December 20, 2004, Dr. Perconte performed a consultative psychological examination of Pryor. In his examination report, Dr. Perconte made the following statements:

> He reports serving in the Persian Gulf during the first Persian Gulf War in 1991 for approximately eight to nine months. However, the veteran was unable to remember his exact date of his duty assignment in the Persian Gulf and could not remember if he was in the Persian Gulf in 1990 or 1991. He reports serving in an aviation unit in Dharan but was unable to name the unit. The veteran's military occupational specialty was that of cook, and he reports no direct combat exposure. However, the veteran has historically claimed posttraumatic stress disorder secondary to having witnessed SCUD missiles hitting the 14th quartermaster's unit in Dharan during the first Persian Gulf War.
>
> ***
> The claimant reports, "I still wake up in cold sweats and having nightmares about SCUD missiles going up. I can't watch what's going on in Iraq 'cause it brings back the memory of all the people. I scream and holler in my sleep according to

my girlfriend and I keep her wake at night." When asked to specifically describe what his dreamed for about and how they related to his experiences, the veteran reports, "I was by the airport when the SCUD missile hit, near the helipad where I was guarding. I was not too far from the unit. I was guarding the heliport and I could see the SCUD going off while I was watching the helipad when I was on guard duty." Please note that the statement appears to be patently false as the helipads and the airports were not in the location of the barracks used by the 14th quartermaster's unit from Greensburg (Note: The undersigned worked directly with the 14th quartermaster's unit upon return and had the opportunity to interview all this unit's soldiers that were not directly sent to Walter Reed Hospital). The SCUD missiles also hit at night, so the veteran could not have seen it coming in or "watch it explode." The veteran clearly fabricated the report concerning his witnessing of the SCUD missiles to which he attributed his anxiety and "posttraumatic stress disorder" suggesting symptom fabrication and malingering. When asked regarding other symptoms, the claimant reports, "I can't hardly remember things and I had trouble with my memory. My nerves get bad every time I think about the death in Saudi Arabia, I think about the heat over there. That's what really got to me, the heat. I think about it all the time. I don't watch the news because it brings back those memories."

\*\*\*

The claimant obtained a score of 20 out of 30 on the Mini-Mental State Exam for a T-score of 8. This is far below average for his age and education level, and well below the cut off for a diagnosis of organic disorder. Given this claimant has no history of organic disorder and was able to be employed up until approximately two months ago, it is the opinion of this examiner that his performance on the Mini-Mental State Exam was a deliberate attempt to misrepresent his level of functioning, and suggests symptom fabrication and malingering. Overall, his performance was not consistent with his relatively stable job history and lack of evidence of organic impairment of any kind.

\*\*\*

He served in the Army from 1984 to 1992 including eight months in Saudi Arabia during the first Persian Gulf War. The veteran has a military occupational specialty of cook and had no direct combat exposure. Despite this, the veteran claims having posttraumatic stress disorder symptoms from allegedly witnessing the SCUD missiles strike the 14th quartermaster's unit in Dharan. Evidence suggests, however, that the veteran was not in the vicinity of this explosion, and that his symptoms in this regard are largely fabricated.

\*\*\*

The veteran carries a diagnosis of mood disorder, generalized anxiety disorder and posttraumatic stress disorder. It is the opinion of this examiner that the veteran is deliberately presenting himself as significantly more disturbed than he is. The veteran reports consistent posttraumatic stress disorder symptomatology without meeting the criterion for exposure to traumatic stressors that would warrant such a diagnosis. In addition, the veteran is clearly fabricating some of his overseas experiences in terms of severity and impact, and overall, does not show some of the hyperarousal symptoms consistent with this diagnosis. In fact, specifically, his only PTSD-related symptoms appeared to be nightmares and dreams of events that did not occur.

\*\*\*

Overall, it is the opinion of this examiner while the veteran reports some mild anxiety-related symptoms, particularly in the area of socialization, his overall

14

> presentation appears to be much more significantly impaired than the evidence
> would substantiate. Overall, the veteran's presentation of symptoms appears to be
> for secondary financial purposes rather than a true manifestation of his current
> level of functioning.

R. 153-158. Dr. Perconte concluded his report by opining that there was a "total incongruence" between Pryor's stable work history prior to October 2004 and his receipt of a 100% service-connected disability. R. 160.

Pryor takes issue with Dr. Perconte's examination report, which portrays Pryor as a liar. Doc. No. 6, pp. 12-17. The ALJ's hopelessly inadequate evaluation of the evidence renders it impossible to determine the amount of weight given to Dr. Perconte's report. The fact that the record contains a consultative examination report that blatantly attacks Pryor's credibility makes it even more obvious that Pryor was prejudiced by the ALJ's failure to develop a testimonial record at the hearing. Furthermore, the regulation defining the term "medical opinion" provides:

> Medical opinions are statements from physicians and psychologists or other
> acceptable medical sources that reflect judgments about the nature and severity of
> your impairment(s), including your symptoms, diagnosis and prognosis, what you
> can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2). Whatever can be said of the term "medical opinion," it does *not* include Dr. Perconte's statements questioning the *factual* circumstances surrounding Pryor's service in the Middle East. Some of Dr. Perconte's "examination" findings, particularly those concerning Pryor's alleged "malingering," appear to be substantially based on Dr. Perconte's own recollection of interviews that he conducted with members of the 14th Quartermaster Detachment after their return from Saudi Arabia, and on inconsistencies between the accounts given by those servicemen and those later given by Pryor. Unless Dr. Perconte was himself with Pryor in Saudi Arabia when Iraqi Scud missiles were being launched, however, he has no competence to say what Pryor experienced during the 1991 Persian Gulf War. *Schmidt v. Harris*, 498 F.Supp. 1181, 1183, n. 2 (W.D.Mo. 1980)("We discount Dr. Behend's social opinion because there is no showing that he has any expertise as a social evaluator."). Dr. Perconte's inclination to dismiss Pryor's accounts of his experiences in Saudi Arabia obviously predated the consultative examination, since the record contains a treatment note dated May 16, 2000,

15

indicating that Dr. Perconte did not believe that Pryor had witnessed the Scud missile attack against the 14th Quartermaster Detachment. R. 141-142. It is respectfully suggested that, on remand, the Commissioner consider having someone other than Dr. Perconte perform a consultative psychological examination of Pryor, since Dr. Perconte's findings appear to have been influenced by extraneous factors.[3] *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

The ALJ did not devote a significant portion of his opinion to post-traumatic stress disorder. He simply stated that Pryor's screening for this impairment had yielded a "negative" result. R. 19. This conclusory dismissal of Pryor's alleged post-traumatic stress disorder is particularly troubling in light of the long record of treatment notes detailing Pryor's complaints about having "flashbacks" to his days in Saudi Arabia. On August 24, 1998, Pryor requested a note excusing him from having to enter isolation suites in a VA hospital. R. 360-361. Those entering such suites had to wear masks, but Pryor stated that his wearing of a mask would cause him to have flashbacks to Scud missile attacks in Saudi Arabia. *Id.* Of course, those in the vicinity of Scud missile attacks during the 1991 Persian Gulf War often wore masks because of the fear that Iraq's Scud missiles were equipped with chemical weapons. On August 2, 2000, Colleen Paul ("Paul"), a registered nurse, noted that Pryor was being "followed for post-traumatic stress disorder relating to the Gulf War." R. 329. Eight days later, Pryor exclaimed to Dr. Bruce Hartner ("Dr. Hartner"), "I still hear those Scud missiles at times." *Id.* Registered nurse Ann Dietrick ("Dietrich") noted that Pryor had made similar complaints on August 23, 2000. R. 328. Dr. Hartner reported on February 2, 2001, that Pryor had stated, "I think about the Persian Gulf all the time." R. 323. On April 10, 2001, Pryor again told Dr. Hartner that he had been thinking about Scud missile attacks. R. 319. Dr. Howard Garb ("Dr. Garb") stated on May

---

[3]Dr. Perconte stated that Pryor had reported "consistent posttraumatic stress disorder symptomatology without meeting the criterion for exposure to traumatic stressors that would warrant such a diagnosis." R. 158. This statement is particularly troubling. Dr. Perconte appears to have made an alleged "medical" judgment (i.e., the absence of a criterion for a mental disorder) by relying on extraneous information (i.e., his belief that Pryor had not actually witnessed Scud missile attacks). Because of the complexity of mental illness in general and malingering in particular, it is often difficult to determine where the line should be drawn between a true "medical assessment" and an assessment based on other factors related to a claimant's credibility. *Morales v. Apfel*, 225 F.3d 310, 317-319 (3d Cir. 2000). This case does not require an exhaustive analysis of that issue. It is clear that a psychologist's expertise does not extend to knowledge about what a particular American soldier has experienced in a war.

2, 2001, that Pryor was having "nightmares and intrusive thoughts" concerning his time in Saudi Arabia. R. 318. Dr. Hartner reported on June 15, 2001, that Pryor had been "hearing noises from the Persian Gulf like Scuds." R. 314. On January 2, 2002, Pryor told Dr. Hartner that he had been having flashbacks related to people whom he had met while stationed in Saudi Arabia. R. 306. Dr. Hartner observed on August 6, 2002, that Pryor had been waking up "in a cold sweat" while experiencing flashbacks to the 1991 Persian Gulf War. R. 300. A treatment note written by Dr. Hartner indicates that, on July 29, 2003, Pryor had denied experiencing hallucinations and delusions but had nevertheless complained about flashbacks to his time in Saudi Arabia. R. 293. Almost a year later, on July 6, 2004, Pryor again told Dr. Hartner that he was experiencing war-related flashbacks. R. 285. On December 21, 2004, Dr. Hartner noted that Pryor had reported flashbacks "of Scud missiles." R. 279. This long record of treatment notes concerning Pryor's flashbacks to Scud missile attacks and similar events in the Middle East, which spanned a period exceeding six years, warranted more discussion in the ALJ's opinion than a single sentence stating that Pryor had tested "negative" for post-traumatic stress disorder. R. 19. That is particularly true in this case, given that the ALJ may have been significantly influenced by Dr. Perconte's highly inappropriate statements.

Of course, the existence of treatment notes recounting Pryor's alleged flashbacks to the 1991 Persian Gulf War does not conclusively establish that Pryor suffers from post-traumatic stress disorder. On January 9, 2006, certified registered nurse practitioner Deborah E. Young ("Young") screened Pryor for post-traumatic stress disorder by asking him four questions related to his symptoms. R. 260. This screening yielded a "negative" result. *Id.* It may be that the ALJ's statement about a "negative" screening result for post-traumatic stress disorder was a reference to Young's notation rather than a reference to Dr. Perconte's findings. Because the ALJ did not place a citation at the end of that sentence, there is no way to tell what evidence he was relying on to make that statement. R. 19. In any event, however, the ALJ was not entitled to rely solely on the results of Pryor's 2006 screening test without explaining what weight (if any) he was giving to the six years of treatment notes detailing symptoms consistent with post-traumatic stress disorder. *Reefer*, 326 F.3d at 382.

On May 10, 1996, clinical and forensic psychologist Thomas Eberle ("Eberle") made the following observations after examining Pryor:

> The patient was in the U.S. Army between October of 1984 and May of 1992. He did see a short tour of duty in Saudi Arabia in this regard, but was not exposed to any combat or other trauma. He functioned as a cook.
>
> \*\*\*
>
> It should be noted that a number of psychiatric examinations from the service and afterwards indicated that the patient's anxiety reaction with its physical concomitance appears to have been caused by normal stresses and strains of the service and other life stressors that generally would not have caused psychiatric problems in the average person. Considering the fact, however, that the patient is clearly of borderline intellectual capacity, his vulnerability to developing an anxiety disorder in the face of such things as the rigors of military service and being deployed to Saudi Arabia is much greater.
>
> \*\*\*
>
> It is this examiner's opinion that the patient does have an anxiety disorder that was instilled in him by the rigors of military service, but it should be noted that this condition, in all likelihood, has developed as a result of his reaction to the stressors coming from a position of reduced intellectual capacity, understanding and individual flexibility. Were the patient of average intelligence, this condition might not have developed, but clearly this has not been the case.
>
> \*\*\*
>
> The extent to which the patient's symptoms are active is difficult to ascertain since he says they occur on a monthly to weekly basis, but in view of his difficulty in expression and his limited intellect, it may well be that these symptoms are somewhat more pronounced than he is able to outline. In any event, however, at the present time he appears to be showing mild to, at most, definite impairments in social and occupational adaptability.

R. 366-369. This examination report illustrates the need for further development of the record. In contrast to Dr. Perconte, who believed that Pryor was malingering, Eberle believed that Pryor's lack of ability to articulate himself may have caused him to understate the severity of his symptoms. Eberle's report also suggests that Pryor may have been more significantly impacted by his experiences in the 1991 Persian Gulf War than most veterans would have been under similar circumstances. In addition, it is worth noting that Pryor's alleged service as a cook in locations distant from the front lines is not necessarily inconsistent with his complaints of flashbacks involving Scud missile attacks. The Scud missile that destroyed the barracks housing the 14th Quartermaster Detachment was not the only Scud missile launched by Iraq. Judicial notice may be taken of the fact that Iraqi Scud missiles were fired not only against coalition

troops on the front lines, but also against civilian targets (including targets within Israel, which was not even a party to the war). *Namo v. Gonzales*, 401 F.3d 453, 458 (6th Cir. 2005)(taking judicial notice of the overthrow of Saddam Hussein and changed circumstances in Iraq). The record contains ample evidence of an impairment akin to post-traumatic stress disorder, and the Commissioner will need to thoroughly evaluate that evidence on remand. If he concludes that Pryor does not suffer from post-traumatic stress disorder, he will need to explain why he chooses not to credit the evidence which supports the existence of this impairment. *Reefer*, 326 F.3d at 381-382.

The ALJ determined that Pryor had no exertional limitations. R. 18. That determination appears to be consistent with the evidence contained in the record. Nevertheless, on remand, the Commissioner must be sure to consider the combined effect of Pryor's credibly established impairments in determining his residual functional capacity. 20 C.F.R. § 404.1545(a)(2). Pryor evidently suffers from gastroesophageal reflux disease, sleep apnea, irritable bowel syndrome and hypertension. R. 294. Any limitations resulting from these impairments must be fully accounted for in the ultimate residual functional capacity assessment. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). Serious consideration must be given to Pryor's subjective complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-1068 (3d Cir. 1993). While it is the Commissioner's prerogative to evaluate the evidence, he is not free to mischaracterize it. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008).

## VI. CONCLUSION

Because the ALJ failed to develop the testimonial record and neglected to explain his reasons for discounting much of the evidence contained in the documentary record, a remand is required under *Dobrowolsky*, *Fargnoli* and *Reefer*. Accordingly, the motion for summary judgment filed by the Commissioner will be denied, and the motion for summary judgment filed by Pryor will be denied insofar as it seeks an award of benefits and granted insofar as it seeks a remand for further administrative proceedings. In accordance with the fourth sentence of § 405(g), the decision of the Commissioner will be vacated, and the case will be remanded for

further administrative proceedings.  An appropriate order will follow.


<u>Date: March 27, 2009</u>


<u> s/ David Stewart Cercone  </u><br>
David Stewart Cercone<br>
United States District Judge

cc:    Jennifer Andrade, AUSA
       Email: jennifer.andrade@usdoj.gov
       Charles C. Bell, Esq.
       Email: DustychasB@aol.com